UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
CARDREGISTRY, INC.,

                         Plaintiff,

    -against-


COLLECTORS UNIVERSE, INC. d/b/a
PROFESSIONAL SPORTS AUTHENTICATOR,

                    Defendant.       **MEMORANDUM AND ORDER**
--------------------------------------X    22-CV-5308 (KAM)(CLP)

**MATSUMOTO, United States District Judge:**

    On July 7, 2022, Plaintiff initiated the instant action against Defendant Collectors Universe Inc., doing business as Professional Sports Authenticator ("Defendant" or "PSA") in connection with Defendant's alleged mis-authentication of a 1980 Larry Bird, Magic Johnson Scoring Leaders Card (the "Card"). *See generally* (ECF No. 1-2, "Compl.") Plaintiff alleges, in the operative Second Amended Complaint, that Defendant fraudulently misrepresented the authenticity of the Card to a Third Party, and that Plaintiff was injured as a result of its reliance on Defendant's misrepresentation of the Card's authenticity. (*Id.*) Plaintiff argues that Defendant's alleged misrepresentation constitutes fraud under New York common law and seeks compensatory, incidental, or consequential damages; punitive or

exemplary damages, and attorneys' fees in an amount to be determined by the Court.

Presently before the Court is Defendant's motion to dismiss the Second Amended Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6). *See* (ECF Nos. 19-1, "Def. Mot."; 21, "Reply".) Plaintiff opposes Defendant's motion to dismiss. *See* (ECF No. 20, "Ptf. Opp.") For the reasons set forth below, Defendant's motion to dismiss is **GRANTED** and Plaintiff's Second Amended Complaint is **DISMISSED** in its entirety with prejudice.

## FACTUAL BACKGROUND

Defendant PSA is a business that administers authentication and grading services with respect to sports trading cards. (SAC ¶¶ 2, 18-19.) Individual sports card traders send their sports trading cards to Defendant for Defendant to determine whether the card is authentic and free of any tampering, doctoring, or alterations. (PSA ¶¶ 19-21.) If Defendant determines that the card is authentic, Defendant renders a "PSA grade" based on the physical condition of the card and encapsulates the card in a sealed card case reflecting the PSA grade. (SAC ¶¶ 22-23.) By contrast, if Defendant determines that the card is either inauthentic or has been improperly altered, Defendant renders the card ungradable. (*Id.*)

The PSA grades that Defendant applies to gradable cards are based on a 1-10 grading scale, with 10 being the highest grade

and indicative of excellent physical condition.  (SAC ¶ 19.)
The higher the PSA grade that a card possesses, the higher the
resale value of the card.  (SAC ¶¶ 25-26.)

Defendant also authenticates previously graded sports
trading cards for individuals that send in their cards to verify
whether the card is a genuine and authentic PSA-graded item.
(SAC ¶ 29.)  If the card under review by Defendant appears to
have been removed from the Defendant's sealed grading case or if
the case reflects signs of tampering, such as cracks or tears,
Defendant will render the card a "taken-out card," which loses
its PSA grade and, as a result, its attendant resale value.
(SAC ¶¶ 30-31.)

On January 13, 2016, Plaintiff sold a 1980 Larry Bird,
Magic Johnson Scoring Leaders Card (the "Card") to a third
party, Justin Cornett (the "Third Party").  (SAC ¶ 37.)  At the
time that Plaintiff sold the Card to the Third Party, the Card
possessed a PSA 10 grade and was encapsulated in a sealed card
case that reflected the PSA 10 grade.  (SAC ¶ 38.)  On January
21, 2016, the Third Party submitted the Card to Defendant for
authentication and Defendant allegedly verified to the Third
Party that the PSA 10 grade was genuine.  (SAC ¶¶ 40, 45-46.)
According to Plaintiff, the Third Party is one of Defendant's
"major clients."  (SAC ¶ 53.)  Defendant returned the Card to
the Third Party on January 25, 2016 and the Third Party listed

the Card on an online auction marketplace.  (SAC ¶¶ 51-52.)
Plaintiff alleges that it was not aware of the Third Party's
efforts to verify the Card's PSA grade in January 2016.  (SAC ¶
66.)

In February 2016, Plaintiff became aware of an allegation
from an unknown individual that the Card did not reflect a
genuine PSA 10 grade and that the Card had been tampered with.
(SAC ¶¶ 57-58, 63.)  In February 2016, Plaintiff also became
aware of an FBI investigation into allegations that certain
cards sold by Plaintiff, including the Card, were inauthentic or
otherwise compromised.  (SAC ¶¶ 59, 63.)  After learning of the
tampering allegation and the FBI investigation, Plaintiff
encouraged the Third Party to submit the Card to Defendant for
verification of the PSA 10 grade.  (SAC ¶ 65.)  At this time,
the Third Party advised Plaintiff that he was aware of the
anonymous allegation and the FBI investigation and that he had
already submitted the Card to Defendant for authentication in
January 2016, whereupon he received confirmation that the Card
reflected a genuine PSA 10 grade.  (SAC ¶ 63-65.)  Nevertheless,
the Third Party de-listed the Card from the online marketplace
and submitted the Card to Defendant for "unknown reasons."  (SAC
¶¶ 61-62.)

Plaintiff alleges that upon Defendant's receipt of the Card
from the Third Party, Defendant removed the Card from its sealed

4

card case, which had the effect of compromising the Card's grade and diminishing the value of the Card.  (SAC ¶¶ 68-70.) Plaintiff speculates that Defendant removed the Card from its sealed card case in order to conceal the fact that Defendant had misrepresented the Card as a PSA-10 graded item to the Third Party on January 25, 2016.  (SAC ¶¶ 93-94.)

While the Card was in Defendant's custody, the Third Party requested a refund from Plaintiff, which Plaintiff honored in full on May 31, 2016.  (SAC ¶¶ 71-72.)  Following Plaintiff's issuance of the refund to the Third Party, Plaintiff received the taken-out Card from Defendant on June 18, 2016.  (SAC ¶ 77.) At the request of the FBI, Plaintiff submitted the Card to the FBI and followed up with Defendant via telephone on several occasions in June, July, and August of 2016 to seek an explanation for Defendant's removal of the Card from the sealed card case.  (SAC ¶¶ 78-83.)  Because Plaintiff purportedly believed that Defendant had removed the Card from its sealed card case by accident, Plaintiff also requested that the Card be re-graded.  (SAC ¶¶ 82-83.)

In March 2020, the FBI returned the Card to Plaintiff, which prompted Plaintiff to follow up with Defendant throughout April, May, and June of 2020 to reiterate Plaintiff's request that the Card be re-graded.  (SAC ¶¶ 84-85.)  On May 4, 2022, a representative of Defendant responded to Plaintiff's outreach

5

via email and stated that the Card did not possess a PSA 10 grade, was not an authentic PSA-graded item, and had never been graded by Defendant.   (SAC ¶ 87.)   Plaintiff alleges that Defendant must have known that the Card was not an authentic PSA-graded item on January 25, 2016, when the Third Party requested verification of the Card's PSA grade.

## PROCEDURAL BACKGROUND

Approximately three months after receiving the May 4, 2022 email from Defendant, Plaintiff filed the instant action alleging breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, and intentional interference with a prospective economic advantage.  *See generally* (Compl.) Plaintiff also sought $2,000,000 in damages and an additional amount of punitive damages.[1]  The Court held a November 1, 2022 Pre-Motion Conference in anticipation of Defendant's motion to dismiss the Complaint.

Following the Pre-Motion Conference, Plaintiff filed an Amended Complaint (ECF No. 13, Amended Complaint, "AC"), which abandoned the previously stated claims and purported to represent a putative class action pursuant to Fed. R. Civ. P. 23.  *See generally* (AC.)  In the Amended Complaint, Plaintiff raised claims of fraud under New York law, consumer fraud under

---

[1] It is unclear from the face of the Complaint whether Plaintiff sought "Two . . . Million" or "($1,000,000)" in punitive damages.  (Compl. ¶ 65.)

New Jersey law, and a civil Racketeer Influenced and Corrupt Organization ("RICO") conspiracy in violation of 18 U.S.C. § 1962(c).  (*Id.*)  Plaintiff sought declaratory and injunctive relief as well as monetary damages.  (*Id.*)  The Court held a second pre-motion conference in anticipation of Defendant's motion to dismiss the Amended Complaint on January 5, 2023.  In light of "the deficiencies [in the Amended Complaint] discussed during the pre-motion conference," Plaintiff agreed to conduct further research and investigation and file a Second Amended Complaint.  (Jan. 5, 2023 Min. Entry.)

On January 25, 2023, Plaintiff filed the Second Amended Complaint, abandoning the New Jersey statutory claim, the civil RICO claim and the class-action allegations.  *See generally* (ECF No. 19, Second Amended Complaint, "SAC".)  The Second Amended Complaint asserts a single claim of fraud under New York common law.  (*Id.*)

## LEGAL STANDARD

### I.  Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  The Court reviews the operative Second Amended Complaint, "accept[ing] all factual allegations as true," for the purposes

of Defendant's 12(b)(6) motion, and "draw[ing] all reasonable inferences in" Plaintiff's favor. *Melendez v. City of New York*, 16 F.4th 992, 1010 (2d Cir. 2021). To the extent Plaintiff draws "legal conclusion[s] couched as factual allegation[s]," however, the Court is not bound to accept such statements as true. *Drimal v. Tai*, 786 F.3d 219, 223 (2d Cir. 2015) (citing *Iqbal*, 556 U.S. at 678).

The Court must dismiss Plaintiff's Second Amended Complaint if Plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## II. Fraud

### A. Federal Rule of Civil Procedure 9(b)

For New York common law fraud claims asserted in a federal diversity action, pleadings are subject to a higher pleading standard. Fed. R. Civ. P. 9(b), which governs pleadings for special matters such as "fraud or mistake," dictates that "a party must state with particularity the circumstances constituting fraud," such as "[m]alice, intent, knowledge, and other conditions of a person's mind[.]" Courts in the Second

Circuit interpret Fed. R. Civ. P. 9(b) to "require[] that plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (internal citation and quotation marks omitted).  "Allegations that are conclusory or unsupported by factual assertions" will not satisfy the pleading standards set forth in Fed. R. Civ. P. 9(b).  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir. 2007).

**B. Common Law Fraud**

Under New York law, in order to state a claim for fraud, plaintiff must identify "a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant," and which was "made for the purpose of inducing [plaintiff] to rely upon" the alleged misrepresentation or material omission.  *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (citing *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996)).  Plaintiff must also allege that its reliance on the alleged misrepresentation or material omission was reasonable and "justifiable" and that Plaintiff was "injur[ed]" as a result.  *Id.*

9

**DISCUSSION**

In its motion to dismiss the Second Amended Complaint,
Defendant first asserts that Plaintiff's claim for fraud is time
barred pursuant to N.Y. C.P.L.R. § 213(8).  Defendant also
argues that, in any event, Plaintiff has failed to state a claim
for fraud based on the facts alleged in the Second Amended
Complaint.  Specifically, Defendant argues that Plaintiff failed
to identify a misrepresentation which was made by Defendant to
Plaintiff, failed to allege facts that show Defendant acted with
knowledge of falsity or with the intent to deceive Plaintiff,
failed to allege justifiable reliance on Defendant's statements
to the Third Party, and mischaracterized the applicable damages.

For the reasons set forth below, the Court finds that
Plaintiff's claim is time barred and that, in any event,
Plaintiff has failed to state a claim for fraud.

**I.   Statute of Limitations**

Under New York law, a fraud claim must be commenced either
"six years from the date the cause of action accrued or two
years from the time the plaintiff . . . discovered the fraud, or
could with reasonable diligence have discovered it[,]" whichever
time is greater.  N.Y. C.P.L.R. § 213(8).

Plaintiff alleges that, upon request on January 21, 2016
by the Third Party that Defendant authenticate the Card,
Defendant misrepresented the authenticity of the PSA 10 grade

10

reflected on the Card on January 25, 2016, knowing that the PSA 10 grade was not in fact authentic.  (SAC ¶¶ 40, 45-47, 51.) Accordingly, Plaintiff's Second Amended Complaint alleges that January 25, 2016, is the date of the alleged misrepresentation. (Def. Mot. at 25) (citing SAC ¶¶ 45-46.)  Nevertheless, Plaintiff alleges that it did not become aware of the fraudulent nature of the alleged misrepresentation until a representative of Defendant emailed Plaintiff on May 4, 2022 stating that the Card was "not an authentic PSA-graded item" and "not something [Defendant] ever graded."  (SAC ¶ 87.)  Plaintiff contends that between the date of Defendant's alleged misrepresentation, January 25, 2016, and the date on which Defendant purportedly revealed the fraudulent nature of the alleged misrepresentation, May 4, 2022, Plaintiff "had no reason to believe Defendant made [an] intentional misrepresentation."  (SAC ¶ 127.)  According to Plaintiff, the July 7, 2022 Complaint was filed within two years of Plaintiff's discovery of Defendant's alleged fraud and is, therefore, timely under N.Y. C.P.L.R. 213(8).

Defendant, by contrast, argues that, based on the allegations in the Second Amended Complaint, Plaintiff "had every reason to believe" that the Card did not reflect an authentic PSA 10 grade well in advance of Defendant's May 4, 2022 email.  (Def. Mot. at 10.)  Defendant points to several allegations in the Second Amended Complaint, which confirm that

by June 18, 2016, Plaintiff was aware of facts indicating that the Card did not merit a PSA 10 grade, and specifically that Plaintiff was aware of any alleged fraud by June 18, 2016 at the latest. (Def. Mot. at 10.) In particular, Defendant points to Plaintiff's factual assertions in the Second Amended Complaint that (1) Plaintiff became aware of an allegation from an unknown person in January 2016 that the Card's PSA 10 grade was inauthentic (SAC ¶ 57), that (2) Plaintiff learned of an FBI investigation into possible tampering with the Card on February 27, 2016 (SAC ¶ 63), that (3) during the FBI's investigation, the Third Party requested a refund for his purchase of the Card from Plaintiff notwithstanding the alleged confirmation from Defendant that the Card's PSA 10 grade was accurate (SAC ¶ 71), that (4) Plaintiff honored the Third Party's refund request on May 31, 2016, even though neither Plaintiff nor the Third Party were in possession of the Card at the time (SAC ¶ 72), and that (5) Plaintiff ultimately received the Card from Defendant on June 18, 2016, at which point Plaintiff was aware that the Card had been removed from the case reflecting a PSA 10 grade and had lost both its PSA 10 grade and "a large portion of its market value" as a result. (SAC ¶¶ 69, 76-77.)

Plaintiff concedes that it "had knowledge of the questionable authenticity of the card" in 2016 (Ptf. Opp. at 6), but argues that it did not have knowledge of Defendant's

allegedly fraudulent misrepresentation until years later in May 2022.  Plaintiff further argues that Defendant conflates the question of Plaintiff's knowledge of the authenticity of the Card's PSA 10 grade with Plaintiff's awareness that Defendant's authentication of the Card to the Third Party was a fraudulent misrepresentation.  (Ptf. Opp. at 13.)  However, the two inquiries are inextricably intertwined and Plaintiff's efforts to draw a hard line of distinction are unavailing.  This is because the many facts alleged in the Second Amended Complaint that indicated to Plaintiff that the Card did not in fact merit a PSA 10 grade would necessarily implicate any purported verification of the PSA 10 grade by Defendant.  *See Town of Poughkeepsie v. Espie*, 840 N.Y.S.2d 600, 603 (N.Y. App. Div. 2007) ("A cause of action alleging fraud accrues at the time the plaintiff possesses knowledge of facts from which the fraud could have been discovered with reasonable diligence") (internal citation omitted).

The Second Circuit's opinion in *Koch v. Christie's International PLC*, 699 F.3d 141 (2d Cir. 2012) is particularly instructive on this point.  In *Koch*, plaintiff bought a purportedly rare wine from a third party that was authenticated by the defendant.  As in the instant case, plaintiff alleged that the defendant fraudulently and knowingly misrepresented the authenticity of the product at issue.  The Second Circuit

affirmed the district court's finding that plaintiff's inquiry notice had been triggered by the time plaintiff received information casting "serious doubt on" the authenticity of the rare wine, which the court did not distinguish from the defendant's authentication of the wine. *Koch*, 699 F.3d at 153. Here too, Plaintiff's inquiry notice arose at the time Plaintiff repeatedly received information that the Card's PSA 10 grade was likely inauthentic between January and June 2016. As the Second Circuit made clear, the warning signs which triggered Plaintiff's duty to investigate "need not detail every aspect of the alleged" fraud. *Id.* at 151 (internal citation omitted). "Rather, such storm warnings are sufficient where, 'a person of ordinary intelligence would consider it probable that fraud had occurred.'" *Id.*

Based on the factual allegations in the Second Amended Complaint, "a person of ordinary intelligence would [have] consider[ed] it probable that fraud had occurred" by June 18, 2016. *Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 708 (S.D.N.Y. 2019) (internal citation omitted). Starting in January 2016 and by June 18, 2016, Plaintiff was aware of several factual circumstances that strongly suggested the Card's PSA 10 grade was inauthentic, including an anonymous allegation of fraud and an FBI investigation into tampering, which Plaintiff became aware of on

14

February 27, 2016.  (SAC ¶ 63.)  Plaintiff also honored a refund
request from the Third Party on May 31, 2016 (SAC ¶ 72),
seemingly without any guarantee or indication that Plaintiff
would regain possession of the Card.  Importantly, Plaintiff
became aware that the Card was removed from the sealed card case
and no longer possessed a PSA 10 grade as a result by June 18,
2016.  (SAC ¶¶ 76-77.)  "[U]nder the totality of the
circumstances," Plaintiff had a duty to "exercise [] reasonable
diligence" and pursue an investigation into the "uncontroverted
evidence" that the Card did not reflect an authentic PSA 10
grade.  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406,
426-28 (2d Cir. 2008) (internal citation omitted).

Indeed, Plaintiff was motivated by those indications of
fraud to pursue some investigative efforts.[2]  Plaintiff reached
out to Defendant in order to seek an explanation for Defendant's
removal of the Card from the sealed card case throughout June,
July, and August of 2016.  (SAC ¶¶ 78-83.)  Plaintiff provides

---

[2] The Second Circuit has explained that in circumstances where "some
inquiry is made, the court will impute knowledge of what a plaintiff in the
exercise of reasonable diligence should have discovered concerning the fraud,
and [that] in such cases the limitations period begins to run from the date
such inquiry should have revealed the fraud."  *Cohen v. S.A.C. Trading Corp.*,
711 F.3d 353, 362 (2d Cir. 2013) ("[T]he date on which knowledge of a fraud
will be imputed to a plaintiff can depend on the plaintiff's investigative
efforts.").  The Court construes Plaintiff's outreach efforts to Defendant in
June, July, and August of 2016 as constituting "some inquiry" and finds that
the limitation period began to run when Plaintiff abandoned its inquiry
efforts after August 2016.  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d
161, 168 (2d Cir. 2005).

no explanation for why Defendant's conduct was sufficient to motivate Plaintiff to repeatedly demand an explanation in 2016, but insufficient to file the instant action when Defendant failed to provide any explanation or to respond to Plaintiff's inquiry. *See Fire & Police Pension*, 368 F. Supp. 3d at 709 (noting that "Plaintiff provides no explanation for why the evidence it relies on was insufficient to put it on inquiry notice [initially], but sufficient to file a lawsuit" five years later). The notion that Plaintiff believed Defendant's removal of the Card from the sealed card case to be a "mistake" such that there was "no motive for investigation" (Ptf. Opp. at 18), is inconsistent with the reality that Plaintiff did in fact pursue investigative efforts in June, July, and August of 2016 by demanding an explanation for Defendant's conduct. If Plaintiff had attributed Defendant's removal of the Card from the sealed card case to the ordinary "mishandling . . . risk inherent in any . . . authentication" (Ptf. Opp. at 17), Plaintiff would not have been motivated to "contact[] Defendant multiple times, demanding [an] explanation" and then abandon those efforts without any re-grading. (Ptf. Opp. at 9.) Moreover, after three months of making such demands and receiving no response, Plaintiff's decision to discontinue any investigative efforts and to abstain from seeking legal recourse for another four years, particularly in light of the FBI

16

investigation, anonymous allegations of fraud, and the Third
Party's refund request, is objectively unreasonable and amounts
to "shut[ting] [ones] eyes to the facts," where further inquiry
"would have developed the truth." *Armstrong v. McAlpin*, 699
F.2d 79, 88 (2d Cir. 1983) (internal citation omitted).

Finally, Plaintiff's contention that "New York courts will
not grant a motion to dismiss a fraud claim where the
plaintiff's knowledge is disputed" is inapplicable to the
instant case.  Plaintiff correctly notes that "[w]hether a
plaintiff had sufficient facts to place it on inquiry notice is
often inappropriate for resolution on a motion to dismiss."
*Lentell*, 396 F.3d at 168 (internal quotation marks and citation
omitted).  However, "where the facts needed for determination of
when a [plaintiff] would have been aware of the existence of
fraud can be gleaned from the complaint and papers . . .
[courts] can readily resolve the issue on a motion to dismiss,
and have done so in a vast number of cases." *Id.*  Here, the
dates on which Plaintiff obtained knowledge about the alleged
fraud are not in dispute.  Moreover, "there is no factual
dispute about what knowledge [plaintiff] had . . . rather, the
question is whether [plaintiff] could reasonably have inferred
the fraud from that knowledge." *Koch*, 699 F.3d at 155 (finding
that "[plaintiff] could have inferred the fraud . . .  when he
learned that there was a high probability that the [product]

17

that he alleges he bought in reliance on the representations of authenticity made by [defendant] was in fact counterfeit").

In light of the totality of the circumstances set forth in the Second Amended Complaint, which the Court assumes are true for purposes of Defendant's motion, the Court finds that Plaintiff received "inquiry notice," which gave rise to "a duty of inquiry" by June 18, 2016. *Lentell*, 396 F.3d at 168. Because Plaintiff pursued initial investigative efforts through its outreach to Defendant in June, July, and August of 2016, the Court finds that "the limitations period [began] to run from the date such inquiry" was discontinued after August 2016. *Id*. The instant suit was not filed until July 7, 2022, well over two years after Plaintiff "could with reasonable diligence have discovered" the alleged fraud. N.Y. C.P.L.R. 213(8). Accordingly, Plaintiff's fraud claim is time barred under N.Y. C.P.L.R. 213(8).

## II.  **Fraud Claim**

Because Plaintiff's claim is time barred, the Court need not determine whether Plaintiff has alleged sufficient facts to state a prima facie claim for fraud under New York law. Even so, the Court finds that Plaintiff's claim for fraud fails on the merits as well. As previously noted, "the five elements of a fraud claim [are] . . . (1) a material misrepresentation . . . (2) made by defendant with knowledge of its falsity (3) and

18

intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006).

Plaintiff alleges in the Second Amended Complaint that as of January 25, 2016, Defendant had knowingly misrepresented the Card as having a genuine PSA 10 grade to the Third Party, when in fact the Card did not have a PSA 10 grade and had never been graded at all. (SAC ¶¶ 120-21.) Plaintiff further alleges that Defendant made the alleged misrepresentation with the intent to defraud Plaintiff and for the purpose of inflating the resale value of the Card. (SAC ¶¶ 111, 113.) Plaintiff contends that it relied on the alleged misrepresentation when issuing a refund to the Third Party on May 31, 2016. (SAC ¶ 104.) As a result of the alleged misrepresentation, Plaintiff asserts that Defendant "hindered Plaintiff's business plan to trade [the Card]" and caused "significant financial harm to Plaintiff." (SAC ¶ 110.)

Although the Court finds that Plaintiff has adequately alleged facts to support the first element of its fraud claim, Plaintiff fails to allege sufficient facts that support a plausible claim of fraud with respect to Defendant's knowledge of falsity, Defendant's intent to deceive, Plaintiff's justifiable reliance on the alleged misrepresentation, and any resulting injury or damages.

**A.   Misrepresentation**

To state a claim for fraud, Plaintiff must first identify a "misrepresentation or omission of material fact[.]"  *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

As set forth previously, Plaintiff alleges that "Defendant misrepresented that [the Card] was a genuine PSA 10 grade card." (SAC ¶ 121.)  Plaintiff clarifies in its opposition to the motion to dismiss that the alleged misrepresentation was communicated by Defendant to the Third Party—not to Plaintiff—by January 25, 2016.  (Ptf. Opp. at 25) (citing SAC ¶¶ 45-46.) Defendant allegedly reviewed the Card, which had been submitted to Defendant by the Third Party on January 21, 2016 (SAC ¶ 43), and verified the Card's PSA 10 grade on or by January 25, 2016. (SAC ¶ 46.)  When Plaintiff became aware of an anonymous allegation of tampering and a related FBI investigation, Plaintiff encouraged the Third Party to submit the Card to Defendant for authentication, at which point Plaintiff was informed by the Third Party that Defendant had already authenticated the Card on January 25, 2016.  (SAC ¶¶ 66-67.)

Defendant argues that Plaintiff fails to allege any facts that identify a misrepresentation made by Defendant directly to Plaintiff.  This argument misunderstands the standard for the first element of a fraud claim under New York law.  Plaintiff need not allege that Defendant's alleged misrepresentation was

20

made directly to Plaintiff.  *See Sec. Inv. Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 78 (2d Cir. 2000) ("New York law is fairly clear that a plaintiff may establish reliance on misrepresentations it receives from a third party"). Defendant's reliance on *Woods v. Maytag Co.*, 807 F. Supp. 2d 112 (E.D.N.Y. 2011) is inapposite.  In *Maytag*, the court rejected plaintiff's attempt to attribute an alleged misrepresentation by a third party to the defendants through a theory of agency.  *See* 807 F. Supp. 2d at 121.  The court reasoned that the representation made by an employee of a defendant corporation could not be attributed to the defendant corporation as a whole. *See id.*

Here, Plaintiff does not allege that the Third Party was an agent of Defendant or that the Third Party made a fraudulent misrepresentation.  Instead, Plaintiff alleges that Defendant "supplied false information to a third party to obtain a [benefit] . . . which [] plaintiff[] relied upon to [its] detriment."  *Caramante v. Barton*, 494 N.Y.S.2d 498, 500 (N.Y. App. Div. 1985).  New York courts regard allegations of this sort as satisfying the first element of a fraud claim under New York law.  *See Tindle v. Birkett*, 64 N.E. 210, 211 (N.Y. 1902). Moreover, Defendant does not appear to dispute Plaintiff's allegation that Defendant's authentication of the Card on June 25, 2016 to the Third Party was a misrepresentation.  *See* (Def.

Mot. at 12) (Defendant "allegedly misrepresented the Card's authenticity to [the Third Party].")

Accordingly, Plaintiff has alleged sufficient facts to identify a misrepresentation in satisfaction of the first element of a fraud claim under New York law.

**B.   Scienter**

The second and third elements of a fraud claim relate to scienter.  Plaintiff must allege facts that give rise to a strong inference of Defendant's knowledge that the alleged misrepresentation was false and that, in communicating the alleged misrepresentation, Defendant had the intent to deceive.

In order to plead scienter, a plaintiff must allege particularized facts to support an inference that Defendant possessed "an intent to deceive, manipulate or defraud." *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009).  Plaintiff may establish scienter "either by (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.,* 375 F.3d 168, 187 (2d Cir. 2004) (noting that "[a]lthough malice, intent, knowledge, and other condition of mind of a person may be averred generally [under] Fed R. Civ. P. 9(b), this leeway is not a license to

22

base claims of fraud on speculation and conclusory allegations.") (internal quotation marks and citations omitted).

Where, as here, Plaintiff pleads scienter by alleging Defendant's "motive and opportunity to commit fraud," (Ptf. Opp. at 26), the inference of Defendant's knowledge must be "cogent and at least as compelling as any opposing inference" of nonfraudulent intent that "one could draw from the facts alleged." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (Courts must "consider the complaint in its entirety and take into account plausible opposing inferences.") (internal citation omitted).

### 1. Motive

As evidence of motive, Plaintiff points to Defendant's financial incentive to render a PSA 10 grade in order to satisfy a "major client." (Ptf. Opp. at 26) (citing SAC ¶¶ 52-53, 61, 114-117.) Plaintiff explains that by misrepresenting the PSA 10 grade, Defendant helped to inflate the value of the Card, which was in the possession of the Third Party, "a major client [] featured on Defendant's website." (Ptf. Opp. at 6.) By inflating the value of the Card through the assignment of a fraudulent PSA 10 grade, Defendant purportedly empowered the Third Party to demand a higher price for the Card at auction, which would, in turn, incentivize the Third Party to return the

favor to Defendant by seeking future authentication of sports trading cards.  (*Id.*)

This allegation of motive, which amounts to a generalized description of the financial incentive that virtually every business possesses to serve its client's interests, fails to establish the inference of scienter required under Fed. R. Civ. P. 9(b).  Although Plaintiff alleges that "[Defendant] may have been pressured to positively report" a higher grade, "these allegations do not give rise to a strong inference that [Defendants] . . . acted with the requisite scienter." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440-41 (S.D.N.Y. 2017).  Plaintiff fails to explain how Defendant's alleged motive is distinct from "motives possessed by virtually all" similarly situated businesses.  *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000) (finding that Plaintiff "had to allege that defendants benefitted in some concrete and personal way from the purported fraud"); *see also In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09-md-2030 (LAP), 2011 WL 536437, at *9 (S.D.N.Y. Feb. 9, 2011) (finding that "Plaintiff's scienter allegations fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit.").

Plaintiff's reliance on *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009) is

24

unavailing.  In that case, the court found that plaintiffs had sufficiently pleaded facts showing that defendants, a group of financial institutions and credit rating agencies, were aware of the false and misleading nature of their credit ratings and that defendants had distorted incentives to promote the knowingly false and misleading credit ratings.  The court explicitly noted that "[t]he existence of conflicts of interest alone typically is not sufficient to establish that defendants 'knowingly' made a false and misleading statement."  *Abu Dhabi*, 651 F. Supp. 2d at 179 (internal citation omitted).  The court in *Abu Dhabi* found that plaintiffs' pleadings went far beyond a bare allegation of conflicts of interest or general profit-seeking incentives.  Specifically, the plaintiffs in *Abu Dhabi* alleged (1) "facts illustrating [defendants'] awareness of, and involvement in the default of" an entity that it applied a high credit rating to, (2) facts demonstrating that defendants "received non-public information that would have directly contradicted the high ratings," (3) public statements from former employees and industry insiders that defendants "knew at the time [their] ratings were issued that the process used . . . was deeply flawed and unreliable"; and (4) evidence of a distorted compensation model that applied only to the ratings at issue.  *Abu Dhabi*, 651 F. Supp. 2d at 178-179.  The plaintiffs explained that "[i]n exchange for allegedly unreasonably high

25

[credit] ratings, [defendants] received fees in excess of three times their normal fees" and that "[defendants] were paid only if they provided the desired ratings." *Id.* at 179.

None of the factors relied upon by the court in *Abu Dhabi* are at play in the instant case.  Plaintiff alleges that Defendant had a generalized financial incentive to satisfy the interests of the Third Party in hopes of maintaining the Third Party as a repeat customer.  Plaintiff does not point to evidence of a distorted fee structure that departs from Defendant's normal compensation model.  Nor does Plaintiff point to any non-public information in the possession of Defendant or any communications from insiders that suggest Defendant knew the Card did not merit a PSA 10 grade on January 25, 2016.  Indeed, Plaintiff does not allege any particularized facts to support an inference that Defendant "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08.  Instead, Plaintiff seeks to draw an inference of knowledge and intent based solely on Defendant's interest in "financially benefit[ting]" its clients.  (SAC ¶ 55.)

At bottom, Plaintiff alleges that the same type of generalized financial incentives that underlie virtually every business's relationship with its customers, creates an inference of fraud.  Plaintiff asks this Court to take the fact-specific analysis in *Abu Dhabi* and extract a sweeping rule that the

26

scienter element of an action for fraud can be met by bare allegations that a defendant has a financial interest in pleasing its clients.  This broad and conclusory theory of scienter is untenable and the Court declines to adopt such a rule.

### 2. Opportunity

As evidence of opportunity, Plaintiff points to the fact that "Defendant was solely responsible for issuing a PSA grade to [the] Card . . . [and that] no one [else] had access to the internal authentication and grading system[.]"  (Ptf. Opp. at 26.)  Plaintiff's factual allegations regarding Defendant's alleged opportunity to defraud, however, are raised for the first time in Plaintiff's opposition brief and the required level of specificity in describing the alleged opportunity to defraud are entirely absent from the Second Amended Complaint.[3] In any event, Plaintiff's allegation does not "amount[] to more than mere access to information," *Abu Dhabi*, 651 F. Supp. 2d at 178, and evidence of access alone is not enough.  Plaintiff fails to "illustrate that [defendants] possessed actual

---

[3] The Court need not address an allegation absent from "the [second] amended complaint and [] raised for the first time in opposition" to the motion to dismiss.  *Gonzalez v. Dist. Council 37, AFSCME, AFL-CIO, SSEU Loc. 371*, 843 F. App'x 361, 363 (2d Cir. 2021).

information that contradicted the [PSA 10 grade]" it assigned the Card.

Taking into account "the complaint in its entirety," as well as "plausible opposing [and non-fraudulent] inferences," this Court finds that the Second Amended Complaint fails to adequately plead facts supporting an inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). This Court cannot find that "a reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged" when Plaintiff itself initially drew an opposing inference of non-fraudulent "mistake." (Ptf. Opp. at 17.) Plaintiff offers no reason why Defendant's May 4, 2022 email weighs against that same inference of non-fraudulent mistake.

### 3. Conscious Misbehavior or Recklessness

Neither can this Court find any facts in the Second Amended Complaint indicating that Defendant engaged in conscious misbehavior or recklessness. Conscious misbehavior or recklessness is defined as "conduct by [Defendant], which is at the least . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to [Defendant] or so obvious that [Defendant] must have been aware of it." *Honeyman v. Hoyt*, 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation

marks and citation omitted).  Plaintiff acknowledges that "mishandling [of the Card] by [Defendant] was [a] risk inherent in any tradable cards submitted for authentication."  (Ptf. Opp. at 18.)  Plaintiff further acknowledges that "verification of certification numbers does not eliminate the risk of buying counterfeit collectives."  (Ptf. Opp. at 24.)  Although the risks inherent in every business transaction are not an excuse for fraud, the totality of circumstances alleged in the Second Amended Complaint do not rise to the level of "egregious refusal to see the obvious."  *Hart v. Internet Wire, Inc.*, 50 F. App'x 464, 466 (2d Cir. 2002) (quoting *Novak*, 216 F.3d at 308).

Under either the "motive and opportunity" or "conscious misbehavior and recklessness" theories of scienter, *Eternity Global*, 375 F.3d at 187, Plaintiff fails to adequately allege that Defendant knew of the falsity of the alleged misrepresentation or that Defendant acted with the intent to deceive.  Accordingly, Plaintiff cannot satisfy the second and third elements of a prima facie fraud claim under New York law.

### C.  Reasonable and Justifiable Reliance

The fourth element of a prima facie claim for fraud requires that Plaintiff allege that it "reasonably relied upon the [allegedly false] representation" made by Defendant.  *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006) (internal citation omitted).

Plaintiff alleges that it relied on Defendant's alleged misrepresentation when issuing a refund to the Third Party on May 31, 2016. (SAC ¶ 104.) By this date, however, Plaintiff was aware of an ongoing FBI investigation into purportedly anonymous allegations of tampering with respect to the Card and Plaintiff had advised the Third Party to submit the Card to Defendant for authentication. (SAC ¶¶ 65-67, 71-72.) Moreover, neither Plaintiff nor the Third Party were in possession of the Card at the time that the Third Party requested and received a refund from Plaintiff. *See* (SAC ¶¶ 71-75) ("While [the Card] was in [Defendant's] custody and while the FBI investigation was ongoing, [the Third Party] requested a refund," which Plaintiff honored in full "on May 31, 2016.") When the Third Party "became aware of the allegation and the FBI investigation[,]" the Third Party "submitted the [Card] to [Defendant] for an unknown reason." (SAC ¶¶ 60-62.)

Plaintiff alleges that while the Card was in the possession of Defendant and in the middle of an FBI investigation into tampering allegations, Plaintiff issued a refund in reliance on Defendant's previous verification of the Card's authenticity which was made to the Third Party months earlier, potentially before the initiation of the alleged FBI investigation. Plaintiff does not allege why it would issue a refund to the Third Party given Plaintiff's reliance on Defendant's

30

certificate of authenticity nor does Plaintiff allege that it had any guarantee, at the time that it issued the refund to the Third Party, that it would ever recover possession of the Card. Indeed, Plaintiff was informed shortly after issuing the refund that "the [Card] [would] not be shipped to Plaintiff" and instead would be submitted directly to the FBI.  (SAC ¶¶ 73-74.) Nor does Plaintiff allege that it made any effort to ascertain the unknown reason that the Third Party returned the Card to Defendant or the reason for which a refund would be warranted notwithstanding the January 25, 2016 confirmation from Defendant that the PSA 10 grade was accurate.  Furthermore, at the time Plaintiff issued a refund to the Third Party, the FBI investigation into allegations of tampering was ongoing and there was no indication that the FBI had concluded that the Card was authentic.

In the face of these factual allegations, the notion that Plaintiff's alleged reliance on Defendant's January 25, 2016 statement to the Third Party was either justified or reasonable would stretch the bounds of credulity for any plaintiff. Plaintiff, however, is not an ordinary layperson in the context of this case.  Plaintiff is a sophisticated member of the collectible sports card trading community and is a corporation that "engages in selling collectible trading sports cards on consignment."  (SAC ¶¶ 14, 17.)  *See Crigger v. Fahnestock &*

*Co.*, 443 F.3d 230, 235 (2d Cir. 2006) ("The law is indulgent of
the simple or untutored; but the greater the sophistication of
[a plaintiff], the more inquiry that is required.").  Plaintiff
had "access to critical information" that should have been cause
for hesitance in issuing the refund, including knowledge of the
FBI investigation and the anonymous allegation of tampering.
*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d
171, 181 (2d Cir. 2007) ("New York courts are generally
skeptical of claims of reliance asserted by 'sophisticated
[plaintiffs] . . . who enjoy access to critical information but
fail to take advantage of that access.'") (internal citation
omitted).

Taking into account "the entire context of the [refund]
transaction," *Emergent Capital Inv. Management, LLC v. Stonepath
Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003),  including the
sophistication of both Plaintiff and the Third Party, the
ongoing FBI investigation into allegations of tampering, the
fact that neither Plaintiff nor the Third Party was in
possession of the Card at the time of the refund request, and
the fact that Plaintiff does not allege that it knew it would
regain possession of the Card, Plaintiff fails to allege that it
reasonably or justifiably relied upon Defendant's alleged
misrepresentation when issuing a refund to the Third Party.
Plaintiff's decision to issue a refund without awaiting or

32

ascertaining the results of the FBI investigation, without
confirming the authenticity of the Card itself, and without
confirming that it could ever regain possession of the Card
amounts to a decision by Plaintiff to "willingly assume[] the
business risk that the facts may not be as represented." *Lazard
Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543
(2d Cir. 1997). Accordingly, Plaintiff has not pleaded
sufficient facts to demonstrate reasonable or justifiable
reliance and cannot satisfy the fourth element of a prima facie
claim for fraud.

### D.   Injury and Recoverable Damages

Finally, Plaintiff has failed to plead sufficient facts
indicating that it suffered a cognizable injury as a result of
Defendant's alleged misrepresentation or that it is entitled to
damages.

Generally, the measure of damages in an action for fraud
"is indemnity for the actual pecuniary loss sustained as the
direct result of the wrong or what is known as the out-of-pocket
rule." *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370,
1373 (N.Y. 1996) (explaining that "[d]amages are to be
calculated to compensate plaintiffs for what they lost because
of the fraud, not to compensate them for what they might have
gained. . . . Under the out-of-pocket rule, there can be no
recovery of profits which would have been realized in the

33

absence of fraud.")  Under limited circumstances, "[t]he recovery of consequential damages naturally flowing from a fraud is limited to that which is necessary to restore a party to the position occupied before commission of the fraud."  *Id*. at 1374 (internal citation omitted).

Plaintiff argues that consequential damages should be awarded in addition to out-of-pocket expenses.  Plaintiff contends that Defendant's alleged misrepresentation "hindered Plaintiff's business plan to trade the [Card], causing significant financial harm to Plaintiff."  (SAC ¶ 110.) However, Plaintiff fails to explain how the alleged hindrance can be attributed to Defendant's misrepresentation regarding the PSA 10 grade, as opposed to the fact that the Card did not merit a PSA 10 grade card, a fact that Plaintiff concedes was knowable prior to Defendant's misrepresentation.  Plaintiff has not adequately or plausibly alleged that its inability to trade the Card naturally flowed from Defendant's misrepresentation regarding the authenticity of the Card.  Accordingly, any hindrance to Plaintiff's business with respect to Plaintiff's ability to trade the Card was not proximately caused by Defendant's conduct and does not merit either out-of-pocket damages or consequential damages. *See Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 105 (2d Cir. 2001) ("The claim [] requires a showing of proximate causation," such that

34

the injury "is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.") (internal citation omitted).

Plaintiff separately points to the cost of "phone calls, emails, and postage costs for the demand letter when making inquiries to Defendant regarding the reason for" Defendant's removal of the Card from its sealed card case and regarding Plaintiff's request that Defendant re-grade the Card.  (Ptf. Opp. at 30.)  However, Plaintiff fails to explain how the cost of sending any one email or making any one phone call to Defendant can be disentangled from Plaintiff's general monthly internet and phone service costs.  Moreover, the notion that Plaintiff's entire case hinges on the cost of emails, phone calls, and postage stamps also calls into question the jurisdiction of this Court to hear this diversity action, which is subject to a $75,000 threshold amount-in-controversy.  *See* 28 U.S.C. § 1332(a).  Although Plaintiff alleges in the Second Amended Complaint that "the amount in controversy exceeds $75,000" (SAC ¶ 12), Plaintiff's theory of damages could not support a $75,000 damages award.  *See Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Tr. Co. of Chicago*, 93 F.3d 1064, 1070 (2d Cir. 1996) (noting that dismissal of a complaint "for want of subject matter jurisdiction pursuant to Rule 12(h)(3)" may be

appropriate where "it appears to [be] a legal certainty that the jurisdictional amount required for subject matter jurisdiction . . . cannot be satisfied.")  In any event, the Second Amended Complaint fails to state a claim for fraud under New York law.

### CONCLUSION

For the forgoing reasons, Defendant's motion to dismiss Plaintiff's Second Amended Complaint with prejudice is **GRANTED**. The Second Amended Complaint is **DISMISSED** in its entirety with prejudice.

Federal Rule of Civil Procedure 15(a) dictates that leave to amend a complaint shall be freely given "when justice so requires."  Although the Second Circuit has advised that "the usual practice upon granting a motion to dismiss [is] to allow leave to replead," *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), Plaintiff has already been granted leave to amend its Complaint twice.  *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) ("leave to amend, though liberally granted, may properly be denied for . . . failure to cure deficiencies by amendments previously allowed") (internal citations omitted).

Based on Plaintiff's repeated failures to cure factual deficiencies in two previous amendments, the Court will not grant further leave to amend.

The Clerk of Court is respectfully requested to enter judgment in favor of Defendant and to close this case.

**SO ORDERED.**

Dated: March 22, 2024
      Brooklyn, New York

_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York